UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                              06 CR. 339 (RPP)

                    - against -

                                              **OPINION AND ORDER**

SEAN STUCKEY,

                              Defendant.
----------------------------------------------------------X

**Robert P. Patterson, Jr., U.S.D.J.**

        Defendant Sean Stuckey made post-trial motions 1) to acquit pursuant to Rule 29

of the Federal Rules of Criminal Procedure, or 2) for a new trial, pursuant to Rule 33 of

the Federal Rules of Criminal Procedure.  For the reasons that follow, the motions are

denied.

### A.  Background

#### 1.  The Indictment

        On April 18, 2006, Defendant, in a one count indictment, was charged with

possessing a firearm and ammunition on or about March 20, 2006, after having been

convicted in a court of a crime punishable by imprisonment for a term exceeding one year,

in violation of Title 18 United States Code, Sections 922(g)(1) and 924(e).

#### 2.  The Proceedings before Judge Jones

        This case was originally assigned to Judge Jones.  Although Defendant elected to

proceed *pro se*, Judge Jones appointed Erika Edwards, Esq., to act as standby counsel.

(Tr. 3/30/07 at 2.)  Before Judge Jones, Defendant challenged the Court's jurisdiction

over him, on various grounds, including the fact that he was "not the all-capital fictitious

person" as charged in the caption and body of the indictment,[1] that he had "no contract with this venue," and that his trial was "an act of involuntary slavery." (Tr. 5/11/07 at 3.) Judge Jones denied Defendant's motion and proceeded to trial. (Id. at 3-4.)

Before voir dire on June 18, 2007, Judge Jones warned Defendant, "If you stand up and begin to make the kind of statements that you have been making about the jurisdictional arguments, I will have to adjourn, send the jury out, and possibly . . . send you out and you will watch the trial in some other way, but it is going on." (Tr. 6/18/07 at 5.)

Despite this warning, Defendant interrupted the voir dire proceedings. (Id. at 33-34.) Judge Jones dismissed the panel for a break and, once again, asked Defendant that he not interrupt the proceedings. (Id. at 34.) Upon his steadfast refusal, she removed him from the courtroom (id. at 40), revoked his *pro se* status (id. at 43-44), and appointed standby counsel to represent him (id. at 44). Defense counsel then alerted the Court that she would need time to prepare an adequate defense. (Id. at 52.) Judge Jones dismissed the jury panel and adjourned the trial until July 23, 2007 to give defense counsel time to prepare.

### 3. Pretrial Proceedings before this Court

On or around July 10, 2007, the matter was transferred to this Court for trial on July 23, 2007. At a pretrial conference on July 11, 2007, Defendant was duly warned by this Court that, should he disrupt the proceedings, no mistrial would be ordered, and he would be removed from the courtroom: "I [will] do everything I can to give this man a

---

[1] It was apparently Defendant's position that his God-given name was not in all capital letters but rather only in initial capital letters (Tr. 3/30/07 at 4), that the person named in the indictment in all capital letters was not him because his God-given name was not used (Tr. 2/23/07 at 2), and that his only covenant was with God and not the Court (Tr. 5/11/07 at 5).

fair trial, but if he prejudices himself after all these warnings, he prejudices himself.

That's his decision.  We're not going to have any mistrials . . . absent some misbehavior

by the government or its witnesses." (Tr. 7/11/07 at 25.)

At the voir dire proceeding on July 23, 2007, Defendant again interrupted the

proceedings, interjecting during the Court's questions to the jury:

> THE DEFENDANT:  I am not Sean Stuckey.  You know I am not the
> defendant that's being charged with this.  I never voluntarily contracted a
> surety for this trading that's been charged.  So I don't know why you
> created this illusion from the beginning in this court.

(Trial Tr. at 25.[2])  In light of Defendant's statements, the Court conferred with counsel for

both sides and, with their approval, posed a final question to the prospective jurors at the

conclusion of voir dire:

> THE COURT:  One further question.  You have heard the comments of
> the defendant here in court.  The defendant's statements before you are
> legal arguments which have been considered by the court and can be the
> subject of an appeal to a higher court.  They are not evidence and are not
> to be considered by the jurors.  You are to decide this case solely on the
> basis of the evidence presented here in court and whatever exhibits are
> admitted in evidence.
>         Is there any juror among you who believes that they will be unable
> to hear and decide this case fairly and impartially based solely on the
> evidence presented here in court.

(Id. at 120-22.)  No juror indicated that he or she would be unable to be impartial.

At the outset of the Government's opening statement, Defendant interrupted the

proceedings:

> THE DEFENDANT:  Mr. Patterson, excuse me.  Excuse me, Mr. Judge
> Patterson.  Did you explain – do you intend on explaining to the jury
> exactly my point in the all capital letter defendant, so that they won't be
> under the impression that I was talking about something frivolous or
> inaccurate?

---

[2] The trial transcript begins on the first day of trial, July 23, 2007, and ends on the final day of jury
deliberations, July 30, 2007.  As the volumes of the trial transcript are consecutively paginated, the pincites
will refer to the page number, and not the date, of the transcript.

(Id. at 137.)  Because Defendant did not cease interrupting, the Government could not

proceed with its opening statement.  (Id. at 140-52.)

At that point, the jurors were excused for a recess, and Defendant was removed

from the courtroom to watch the remainder of the proceedings via closed circuit television

from the cell adjoining the courtroom.  (Id. at 149-50.)  Once the closed circuit television

was set up, the trial continued.

### 4.  The Government's Case

The Government's first witness was Parole Officer Harry Ramirez.  He testified

that he began supervising Defendant in September 2005 and continued to do so until

March 2006.  (Id. at 160-62.)  Defendant reported to Officer Ramirez that he resided at

1327 Merriam Avenue, Bronx, New York.  (Id. at 162, 166.)  Over the course of the

supervision, Officer Ramirez had visited Defendant's residence "approximately ten times"

(id. at 166) and had been inside Defendant's bedroom "a few times" (id. at 164-65).

Officer Ramirez testified that on March 20, 2006, at approximately 2:00 p.m.,

Defendant came to the parole office to report to Ramirez that he was having a problem in

his neighborhood.  (Id. at 165.)  Unable to confer with Defendant at that time, Officer

Ramirez informed Defendant that he would stop by his residence later that evening for a

visit.  (Id. at 165.)

At approximately 11:30 p.m. that evening, Officer Ramirez, along with his partner

Parole Officer Carlos Sanchez, went to 1327 Merriam Avenue to see Defendant.  (Id. at

167-68.)  Officer Ramirez described the residence as "a private house" with individual

bedrooms that are rented out to tenants.  (Id. at 166.)  Officer Ramirez was let into the

house by a woman who had just arrived at the residence in a taxi cab and who said she

was also a resident there.  (Id. at 168-69; see also id. at 290.)  Other than that woman,

Ramirez did not see anyone else inside building, the common areas, or outside

Defendant's bedroom.  (Id. at 169-70.)  Officer Sanchez remained behind in the vehicle

and waited while Officer Ramirez entered Defendant's residence.  (Id. at 290.)

Having entered the residence, Officer Ramirez knocked on Defendant's bedroom

door and waited thirty seconds to a minute for a response.  (Id. at 170.)  After Defendant

inquired who was there and Ramirez identified himself, Defendant opened the door.  (Id.

at 170.)  "As soon as [he] walked in" the door to Defendant's bedroom, Parole Officer

Ramirez saw a gun on top of Defendant's nightstand.  (Id. at 171.)  Ramirez described it

as a small caliber gun whose handle was covered by latex and rubberbands (id. at 172) and

that was, to his best recollection, black and silver in color (id. at 238).

Upon discovering the gun on the nightstand in Defendant's bedroom, Officer

Ramirez "picked it up, took it in [his] possession" (id. at 172) and then handcuffed

Defendant.  When he asked Defendant "what's this doing here" (id. at 208), Defendant

replied "he needed [the gun] for his protection" (id. at 208, 253) and that he "had a

problem with somebody on his floor" (id. at 253).  Ramirez asked Defendant whether he

had "anything else in his room."  (Id. at 281.)  Defendant replied that he had some loose

bullets in tissue in a box on top of his wardrobe closet.  (Id. at 281.)

Approximately five to ten minutes after Officer Ramirez had entered Defendant's

residence (id. at 290), he either telephoned, or was called by, Officer Sanchez and asked

Officer Sanchez to come into the building at that point.  (Id. at 172-73, 290-91, 298.)

Officer Ramirez "mentioned something about a gun, handgun" over the phone.  (Id. at

291.)  Officer Ramirez then went downstairs with Defendant, who was in handcuffs, to let

Officer Sanchez into the house.  (Id. at 173, 291.)  Officers Ramirez and Sanchez escorted

Defendant back upstairs to his bedroom where they sat Defendant on his bed, called the

dispatch for back-up, and waited for back-up to arrive.  (Id. at 173, 291-92.)  Officer

Ramirez showed Officer Sanchez the gun that he had recovered from Defendant's

bedroom (id. at 293) and had placed in his pocket or in his waist (id. at 306).

    After approximately ten minutes, officers from the NYPD arrived and searched

Defendant's bedroom.  (Id. at 293.)  Parole Officer Ramirez turned over the handgun to

one of the police officers.  (Id. at 279.)  Officer Sanchez was in Defendant's bedroom

when the NYPD officers arrived and witnessed the officers' search of the bedroom.  (Id. at

293-94.)  He observed the officers recover bullets from Defendant's wardrobe closet.  (Id.

at 294.)  They recovered both an ammunition box and loose rounds that were in a "tissue

paper." (Id. at 309.)  Defendant was taken into custody by the NYPD, and Officer Ramirez

locked Defendant's bedroom door with Defendant's keys (id. at 174) while Officer

Sanchez was present (id. at 263).

    NYPD Police Officer Robert Regnier was one of the police officers dispatched to

Defendant's residence the evening of March 20, 2006.  Just before midnight, he received a

call directing him and his partner to respond to 1327 Merriam Avenue, Bronx, New York.

(Id. at 315.)  Officer Regnier testified that when he entered Defendant's bedroom, "Parole

Officer Ramirez handed [him] a .380 caliber Bryco semiautomatic handgun."  (Id. at 316.)

The gun was loaded with "one live round of ammunition, .380 caliber, in the chamber, and

four live rounds of ammunition of .380 caliber in the magazine, which was also inserted

into the gun." (Id. at 316.)  Regnier described the firearm as black in color and covered in

part by latex.  (Id. at 388.)

Officer Regnier also collected seven live .380 caliber rounds of ammunition, a white paper towel, thirty-two live .380 caliber rounds of ammunition inside a box of ammunition, and an extra magazine for the weapon, which were recovered as a result of the police officers' search.  (Id. at 317.)  He received these items while in Defendant's bedroom, but he could not recall specifically from which officer.  (Id. at 333.)

Officer Regnier took Defendant into his custody and brought him, along with the evidence he had secured, to the police station for processing.  (Id. at 317.)  At the police station, Officer Regnier asked Defendant pedigree information, which included his name (Sean Stuckey), his date of birth (March 12, 1974), and his address (1327 Merriam Avenue, Bronx, New York).  (Id. at 318, 342-43.)

After completing an arrest report, Regnier vouchered the evidence he received in Defendant's bedroom.  (Id. at 319-21.)  He also scratched his initials on the individual items of evidence.  (Id. at 321-22.)  After doing so, Officer Regnier placed the evidence in a plastic security envelope and stored the envelope in the property locker for safekeeping. (Id. at 321.)

At trial, Regnier identified Government Exhibit 1 as the .380 caliber handgun, additional magazine, and several rounds (including one spent shell casing[3]) that he collected in Defendant's bedroom on or about March 20, 2006.  Officer Regnier's initials were on the gun, magazine, and rounds.  (Id. at 324-26, 333.)  Officer Regnier also identified Government Exhibit 2 as the loose rounds of ammunition, a spare magazine, and a box containing thirty-two .380 caliber rounds of ammunition that he collected in

---

[3] One shell casing was spent because the weapon was fired to test its operability at the NYPD laboratory. (Trial Tr. at 323-24.)

Defendant's bedroom on or about March 20, 2006.  Officer Regnier's initials were on all of these items as well.  (<u>Id.</u> at 333, 361-62.)

### 5.  Defendant's Cross Examination of Officer Ramirez

On cross examination, Officer Ramirez was questioned regarding paperwork that was completed in this case.  He testified that "[t]here was a report that was done" (<u>id.</u> at 233), specifically what he called an "Unusual Incident Report" (<u>id.</u> at 232) that explained the events of Defendant's arrest and told "a story of what happened" (<u>id.</u> at 236).  He testified with less certainty that he included certain details in the report, including the name of the officer to whom he handed the gun (<u>id.</u> at 238) ("Well, I wrote his name as part of – maybe the report being written . . . ."); a description of Defendant's bedroom door (<u>id.</u> at 243) ("I – I – I'm sure I put it in the paperwork, Stuckey's entrance door, his door."); and a description of Defendant's bedroom and where he found the gun (<u>id.</u> at 245) ("As I recall what I wrote the report [sic], I explained – I had to explain the room because of the circumstances of the situation; meaning, I had to write some kind of plan on how this – where I found it and the – sort of the features of the room").  Officer Ramirez testified that "there should be a copy [of the report] filed" at his office.  (<u>Id.</u> at 236.)

Officer Ramirez also testified that he believed he filled out a couple of other forms.  (<u>Id.</u> at 245).  He testified that he was "pretty sure" he would have written down Defendant's statement that he had loose bullets because he "f[ou]nd that an important aspect in the whole situation," but could not say in which form.  (<u>Id.</u> at 282.)

Based on the absence of any Division of Parole reports by Ramirez in the 3500 material, the Court ordered the Government to contact the New York State Division of Parole and obtain any reports that were filed.  (<u>Id.</u> at 286, 359.)  Later that day, the

Government reported that it had contacted the supervisor at the Division of Parole, and the supervisor informed the Government that there was no Unusual Incident Report, or any other written documents by Ramirez, in the files of the Division of Parole.  (Id. at 401-03.) Accordingly, the Court granted Defendant's request to recall Officer Ramirez for further cross examination.  (Id. at 410.)  The Court permitted cross examination with respect to the alleged Unusual Incident Report but not with respect to the additional forms because, after reviewing the record, the Court determined Officer Ramirez never made "a statement that he did in fact [fill out another form]"; instead, he merely made a conclusion that he had to have completed another form.  (Id. at 439-42.)

On further examination about his testimony, Officer Ramirez testified that when he went back to the Division of Parole and searched the files, he found no Unusual Incident Report.  (Id. at 449.)  He stated that he had "made a mistake" when he testified that he had documented the circumstances of Defendant's arrest in such a report.  (Id. at 449.)  He explained that he had found out that an Unusual Incident Report would have been necessary only if he had discharged his gun during the parole visit.  (Id. at 448.)  The defense then rested its case.

### 6.  The Jury Deliberations

The jury began its deliberations at 12:46 p.m. on Thursday, July 26, 2007.  (Id. at 535.)  At 2:53 p.m., the jury sent a note requesting portions of Parole Officer Sanchez's and NYPD Officer Regnier's testimony.  (Id. at 538.)  At six o'clock that evening, the jury sent a note requesting to be excused for the evening and to resume deliberations the following day, stating "we have not reached a decision; we seem to be apart."  (Id. at 544). The jury was excused until the following day at 9:30 a.m.  On July 27, 2007, the jury sent

three notes at different times, requesting certain exhibits, a definition of "to wit" in the

indictment, and the portions of Parole Officer Ramirez's testimony regarding the Unusual

Incident Report and regarding his earlier testimony about the Unusual Incident Report.

(Id. at 547, 554, 555).  Then, at 2:25 p.m., the jury sent a note to the Court which read:

"The jury cannot reach a unanimous verdict."  (Ct. Ex. 14; Trial Tr. at 569.)

> Without objection from either party, the Court brought in the jury and gave the

following instruction:

> THE COURT:  Ladies and gentlemen, I have your note Court Exhibit 14
> . . . .  This happens in some cases.  It's my judgment that I have to give
> you more time.  Let me suggest how it might well be used.
>> First, You might review the charge. . . .
>> Secondly, after thinking about the charge and discussing it, seeing
> whether there is a disagreement about the meaning of any of the standards,
> whatever, that you may want further explanation.
>> Then of course we would ask you to go back through the evidence,
> this was not the most complicated case in the world, to go back through
> the evidence.  If you go back through each witness' testimony and are in
> agreement as to what the witness testified to, you may find you weren't in
> agreement as to what they testified to, that may help you, because then
> you can request portions of the transcript to be read to you or furnished to
> you. . . .

(Trial Tr. at 570-71.)  After finishing the instruction, the Court gave both parties an

opportunity to request any additional instruction.  Both parties indicated that they were

satisfied by the instruction as it was given.  (Id. at 571.)

> The jury returned to its deliberations.  At 3:35 p.m., the jury returned another note

in which it requested twelve copies of the entire transcript of Parole Officer Harry

Ramirez's testimony and twelve highlighters.  (Id. at 572.)  The jury was adjourned for

the weekend and, at 9:30 a.m. on July 30, 2007, the jury was provided with twelve copies

of Officer Ramirez's testimony and twelve highlighters for their resumed deliberations.

(<u>Id.</u> at 577.)  That afternoon at 1:50 p.m., the jury returned a guilty verdict.  (<u>Id.</u> at 578-79.)

### B.  Discussion

Defendant asserts that acquittal is warranted pursuant to Rule 29 of the Federal Rules of Criminal Procedure due to the insufficiency of the evidence to support a conviction and, in the alternative, that a new trial is required by the interests of justice pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Rule 29 permits a defendant to move for a judgment of acquittal after a jury has returned a guilty verdict.  Fed. R. Crim. P. 29(c).  A defendant challenging the sufficiency of the evidence supporting a conviction "bears a heavy burden."  <u>United States v. Finley</u>, 245 F.3d 199, 202 (2d Cir. 2001).  The jury's guilty verdict must be upheld unless the district court concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  <u>United States v. Reyes</u>, 302 F.3d 48, 52 (2d Cir. 2002) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979)).  In making this assessment, the district court must view all the evidence in the light most favorable to the Government and draw all permissible inferences in the Government's favor.  <u>United States v. Guadagna</u>, 183 F.3d 122, 129 (2d Cir. 1999).  The court must analyze each piece of evidence not in isolation but against the totality of the Government's case.  <u>Id.</u> at 131.

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court may grant a defendant's motion for a new trial if "the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[M]otions for a new trial are disfavored in this Circuit," <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995), and the defendant bears the burden of showing that a new trial is warranted, <u>United States v. Sasso</u>, 59 F.3d 341, 350 (2d Cir.

1995).  A court must exercise its authority to grant a new trial where there is a "real

concern that an innocent person may have been convicted."  United States v. Sanchez,

969 F.2d 1409, 1414 (2d Cir. 1992).

The Indictment charged Defendant with possessing a firearm and ammunition after

having been convicted in a court of a crime punishable by imprisonment for a term

exceeding one year in violation of Title 18 United States Code, Sections 922(g)(1) and

924(e).  As both parties stipulated that Defendant had a prior felony conviction (Gov't Ex.

6; Trial Tr. at 312-13) and that the firearm or ammunition had traveled in interstate

commerce (Gov't Ex. 7; Trial Tr. at 393-94), there is no question that the Government met

its burden of proof as to those elements.  The issue was whether there is sufficient

evidence with respect to the element of Defendant's knowing and intentional possession

of a firearm and the ammunition.

### 1.  The Admission and Sufficiency of the Firearm and Ammunition as Evidence

Defendant argues that the firearm and ammunition were improperly admitted into

evidence and are insufficient to support the conviction because chain-of-custody evidence

did not adequately establish that the firearm and ammunition in evidence are the same

firearm and ammunition that were recovered from Defendant's bedroom on the night of

his arrest.

The admission in evidence of the firearm and ammunition is governed by Rule

901(a) of the Federal Rules of Evidence.  Rule 901(a) provides, "The requirement of

authentication or identification as a condition precedent to admissibility is satisfied by

evidence sufficient to support a finding that the matter in question is what its proponent

claims." Fed. R. Evid. 901(a).  This requirement "does not erect a particularly high hurdle" and is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks omitted).  When physical evidence is authenticated by a chain of custody, any flaws in the chain of custody bear only on the weight of the evidence, and not on its admissibility. United States v. Morrison, 153 F.3d 34, 57 (2d Cir. 1998).

Defendant asserts that certain flaws in the chain of custody render the evidence inadmissible.  First, Parole Officer Ramirez, who had not placed his initials on the gun, could not testify with certainty that the firearm admitted into evidence was the same firearm; nor could he name the police officer to whom he handed the firearm in Defendant's bedroom.  (Def.'s Mem. Supp. Mot. 16-17.)  Second, NYPD Officer Regnier could not recall which of the police officers handed him the bullets and magazine once he entered Defendant's bedroom.  (Def.'s Mem. Supp. Mot. 17.)  A review of the testimony offered at trial shows that, despite these flaws, the Government laid a foundation that was sufficient for a reasonable juror to conclude that the firearm and ammunition in evidence were recovered from Defendant's bedroom.

With respect to the chain of custody of the firearm, Parole Officer Ramirez testified he recovered the firearm from Defendant's bedroom in his residence at 1327 Merriam Avenue, Bronx, New York, at around 11:30 p.m. on March 20, 2006.  (Trial Tr. at 167-68.)  When he entered Defendant's bedroom on that evening, he "immediately" saw a small caliber handgun on top of Defendant's nightstand.  (Id. at 171.)  He recalled

that the gun was small, black and silver in color (id. at 238), and covered on the handle by latex or rubberbands (id. at 172).

Upon discovering the handgun, Officer Ramirez picked it up and took it into his possession.  (Id. at 172).  While Parole Officer Sanchez was not present when Ramirez discovered the gun (id. at 306), Officer Sanchez's testimony corroborated that Ramirez had the gun in his possession while in Defendant's bedroom:  Officer Sanchez testified that while they were waiting in Defendant's bedroom for back-up to arrive (id. at 293), Officer Ramirez showed him the small handgun that Ramirez had recovered and placed in his pocket or in his waist (id. at 306-07).

NYPD Officer Regnier was one of the police officers that were called to respond to Defendant's address on the night of Defendant's arrest.  (Id. at 315.)  He testified that when he arrived and entered Defendant's bedroom, Parole Officer Ramirez handed him a loaded .380 caliber Bryco semiautomatic handgun.  (Id. at 316.)  Officer Regnier's description of the gun he received as black in color and covered with a small piece of latex on the handle (id. at 388) for the most part matched Officer Ramirez's description of the gun.  Although Parole Officer Ramirez could not recall the name of the police officer to whom he handed the gun that he had recovered (id. at 238), NYPD Officer Regnier was able to establish that link in the chain.  Regnier testified that it was Officer Ramirez who handed him the gun as soon as Regnier entered Defendant's bedroom.  (Id. at 316.)

With respect to the chain of custody of the ammunition, Parole Officer Sanchez testified that bullets were recovered from Defendant's bedroom.  He testified that he was present when the NYPD officers arrived at Defendant's residence and conducted a search

of the bedroom.  (Id. at 293-94.)  Officer Sanchez observed the police officers recover

bullets from the top of Defendant's wardrobe closet.  (Id. at 294.)  As he described them,

some of the bullets were contained in tissue paper, and some were in a box. (Id. at 309.)

Officer Regnier testified that when he entered Defendant's bedroom, one of the

other officers handed him additional live .380 caliber rounds that were recovered during

the search, which had been completed prior to Regnier's arrival.  (Id. at 336.)  Officer

Regnier's description of the items that were handed to him generally matched Officer

Sanchez's description of the bullets:  Regnier testified that he received seven loose

rounds, a white paper towel, thirty-two additional rounds in a manufacturer's box, and an

extra magazine.  (Id. at 317.)  Although Officer Regnier was not able to recall which

officer handed him these items, he testified that he was in Defendant's bedroom when he

received all of the items.  (Id. at 333.)

After collecting both the firearm and ammunition in Defendant's bedroom,

Officer Regnier took Defendant into custody and brought him, along with the items of

evidence, to the police station for processing.  (Id. at 317.)  After completing the arrest

report, he vouchered the firearm and ammunition.  (Id. at 319-21.)  Officer Regnier

carved his initials on the individual items of evidence (id. at 321-22), and placed them in

a plastic security envelope, which he stored in the property locker for safekeeping (id. at

321).

At trial, Officer Regnier identified Government Exhibit 1 as the .380 caliber

handgun, additional magazine, and several rounds that he had collected from Officer

Ramirez in Defendant's bedroom on or about March 20, 2006.  He was able to recognize

these items by his initials that were on the gun, magazine, and rounds.  (Id. at 324-26,

333.)  Officer Regnier also identified Government Exhibit 2 as the loose rounds of ammunition and box of bullets that he collected from an officer in Defendant's bedroom on or about March 20, 2006.  He was able to recognize these items by his initials, which he had scratched on all of these items as well.  (Id. at 333, 361-62.)

Based on the testimony of Parole Officers Ramirez and Sanchez and NYPD Officer Regnier, in its totality, a reasonable juror could have concluded that the firearm and ammunition entered into evidence were the firearm and ammunition seized in Defendant's bedroom.  The testimony of the three officers established a chain of custody that ended with Officer Regnier, who identified the firearm and bullets entered into evidence as the items he received in Defendant's bedroom and subsequently vouchered at the police station.  The firearm and bullets were therefore properly admitted into evidence under the identification requirement of Rule 901(d).

Defendant's challenge to the evidentiary sufficiency of the firearm and ammunition, in addition to their admissibility, is likewise unavailing.  Viewed in the light most favorable to the Government, the testimony regarding the recovery of the firearm and ammunition is sufficient for a rational trier of fact to find beyond a reasonable doubt that Defendant had knowingly and intentionally possessed those items on March 20, 2006.

Although the defense argues that there was insufficient evidence that the room in which the firearm and ammunition were found was Defendant's bedroom, the evidence showed that Defendant identified 1327 Merriam Avenue as his approved address to Parole Officer Ramirez (id. at 162, 166) and gave that address to Officer Regnier when Defendant was booked following his arrest (id. at 343).  Officer Ramirez, who was

familiar with Defendant's place of residence and had been inside Defendant's bedroom at that address on prior occasions (id. at 164-66, 279), testified that the firearm was on the nightstand in Defendant's bedroom (id. at 171), which Defendant alone occupied (id. at 164).  Officer Sanchez testified that the box of bullets and additional rounds were recovered from the top of the wardrobe closet in Defendant's bedroom.  (Id. at 173, 294.) Finally, NYPD Officer Regnier was handed both the firearm and the ammunition as soon as he entered Defendant's bedroom.  (Id. at 317.)

Based on the evidence presented at trial, a rational juror could also find beyond a reasonable doubt that Defendant's possession of the firearm and bullets was knowing and intentional.  Officer Ramirez testified that when he discovered the handgun on the nightstand and asked Defendant what it was doing there, Defendant replied that he needed the gun "for his protection" (id. at 208, 253) and that he was having trouble with somebody on his floor (id. at 253).  Officer Ramirez also testified that when he asked Defendant if he had "anything else in his room," Defendant replied that there were some loose bullets in tissue in the box on his wardrobe closet. (Id. at 281.)

As Defendant points out, this case comes down to the credibility of the witnesses, particularly Parole Officer Ramirez.  (Def.'s Mem. Supp. Mot. 15.)  On the issue of credibility, "it is well settled that when reviewing the sufficiency of the evidence [the Court] defer[s] to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony."  United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks omitted).  In this case, the jury concluded that the testimony of the three Government witnesses was credible and resolved the inconsistencies in favor of the

Government.  The Court does not disagree with the jury's conclusions.  The evidence presented at trial was sufficient to support Defendant's conviction in this case.

### 2.  The Unusual Incident Report

In support of his Rule 29 and Rule 33 motions, Defendant also points to Officer Ramirez's testimony that he believed he recorded certain information about the circumstances of Defendant's arrest in an "Unusual Incident Report" and various other forms, which were not turned over to the defense in this case.  Defendant argues that the documents likely contain Brady material and would demonstrate that Officer Ramirez committed perjury when he testified at trial as to certain events.  He further argues that even if the documents did not exist, their nonexistence would demonstrate that Officer Ramirez testified falsely at trial and might have caused the jury to disregard his entire testimony.

Defendant's argument as to Brady material lacks support in the record.  To establish a Brady violation, a defendant must show "(1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed was material.'" United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995).  Defendant's claim fails on the first prong of this showing.

Defendant cannot establish that the Government failed to disclose favorable evidence because, despite repeated searches, there is insufficient evidence to conclude that Brady material existed in this case, contrary to defense counsel's assertion.  The testimony of Officer Ramirez (Trial Tr. at 449) and the statements of the Government (id. at 401-03) made clear that Officer Ramirez's testimony that he had filled out an Unusual Incident Report was the result of an erroneous conclusion on his part and incorrect.  With

regard to any additional written documents, the Court concluded based on the trial transcript that Parole Officer Ramirez made "conclusions on his part" about what he might have done in a situation like this one but never "a statement that he did fill out another form." (Id. at 439.) After making additional inquiries of the Division of Parole at the Court's direction for any other documents filed with respect to Defendant's arrest, the Government reported that the Division of Parole had searched and found no documents on file other than those that had already been produced in the 3500 material. (Id. at 401-03.) Indeed, although finding a gun in a parolee's possession was unusual for Ramirez (see id. at 448), an Unusual Incident Report typically relates to the unusual use or firing of a law enforcement officer's firearm (id. at 448). Without any favorable evidence for the Government to disclose, there can be no Brady violation.

Defendant's arguments based on the credibility of Officer Ramirez as a witness are also without merit. Defense counsel had full opportunity to highlight the inconsistencies of Officer Ramirez's testimony when the Court granted defense counsel's motion to recall Officer Ramirez for additional cross examination on the subject of the Unusual Incident Report. Officer Ramirez admitted to the jury that he had made a mistake and that he had never created or filed such a report. (Id. at 449.) After this second cross examination, the jury was aware of Ramirez's incorrect testimony and free to consider the inconsistency of Officer Ramirez's testimony and the likelihood of his explanations in making its determination of the credibility of his testimony as a whole.

Defendant requests that the Court review the credibility of Officer Ramirez and determine that his "testimony is 'patently incredible or def[ying of] physical realities.'" (Def.'s Mem. Supp. Mot. 15 (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d

Cir. 1992))).  The inconsistencies in Officer Ramirez's testimony do not rise to such a

level that the testimony can be deemed "patently incredible."  Instead, the general rule

applies that "when reviewing the sufficiency of the evidence [the Court] defer[s] to the

jury's assessment of witness credibility and the jury's resolution of conflicting

testimony."  Glenn, 312 F.3d at 64 (internal quotation marks omitted).  The jury in this

case reviewed the testimony of Officer Ramirez thoroughly.  During deliberations, the

jury not only requested the portions of Officer Ramirez's testimony concerning the

Unusual Incident Report (Trial Tr. at 538), it also requested and received twelve copies of

the entire transcript of Officer Ramirez's testimony before finally reaching a unanimous

verdict over four hours later (id. at 572).  Ultimately, the jury concluded that Officer

Ramirez's testimony, despite his earlier error, established beyond a reasonable doubt that

Defendant knowingly and intentionally possessed a firearm and ammunition.  The Court

does not disagree with this conclusion.

### 3.   Defendant's Statements in Court and Removal from the Courtroom

In support of his motions, Defendant also argues that the Court should have

granted a mistrial because he was unfairly prejudiced by his own statements in open

court, the conversations between Defendant and the Court in the jury's presence, and the

subsequent removal of Defendant from the courtroom.  While criminal defendants enjoy

the right to be present at every stage of trial under the Sixth Amendment, a defendant

may forfeit this right.  See Illinois v. Allen, 397 U.S. 337, 342-43 (1970).  In Allen, the

Supreme Court held that

> a defendant can lose his right to be present at trial if, after he has been
> warned by the judge that he will be removed if he continues his disruptive
> behavior, he nevertheless insists on conducting himself in a manner so

disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

<u>Allen</u>, 397 U.S. at 343.

In this case, Defendant indeed forfeited his right to be present at his trial. Both Judge Jones (Tr. 6/18/07 at 5) and this Court (Tr. 7/11/07 at 25) gave Defendant fair warnings that if he continued to disrupt the trial proceedings, he would be removed from the courtroom and ordered to watch the trial on closed circuit television from the adjoining cell. Before voir dire began, Defendant was specifically informed that the jury would not be dismissed, nor a mistrial granted, if he interrupted the proceedings and that any outbursts could prejudice the jury against him. (Trial Tr. at 25).

Defendant nonetheless chose to interrupt the voir dire proceedings (<u>id.</u> at 25) and continue his interjections during opening statements (<u>id.</u> at 137). When it became apparent that the Government could not proceed with its opening statement due to Defendant's interruptions (<u>see id.</u> at 140-52), the Court determined that the interest in having Defendant present in the courtroom for his trial was outweighed by the interest in maintaining the proper administration of justice with the requisite degree of order, decorum, and respect for the jurors' time (<u>see id.</u> at 150). The jury was therefore excused while Defendant was ordered to view the remainder of the trial from the adjoining cell block. (<u>Id.</u> at 149-50.) Defense counsel was given the opportunity to consult with Defendant prior to the exercise of peremptory challenges, cross examination of witnesses, and summation.

### 4.  The Court's Instruction to the Jury During Deliberations

Defendant finally argues that the "Court's instruction to the jury after they advised the Court that they were unable to reach a verdict incorrectly led the jurors to

believe that they had no choice but to return a verdict at all costs." (Def.'s Mem. Supp. Mot. at 2.) Because Defendant failed to preserve an objection at trial, the jury charge may be reviewed only for plain error. See Fed. R. Crim. P. 30(d). To show plain error, a defendant must show: (a) an error; (b) that is clear under current law; and (c) that caused prejudice to the defendant. United States v. Feliciano, 223 F.3d 102, 115 (2d Cir. 2000). For an error to be clear under current law, the Second Circuit generally requires that there be binding precedent mandating a reversal. See, e.g., United States v. Weintraub, 273 F.3d 139, 152 (2d Cir. 2001).

Defendant has cited no law under which the Court's instructions were clearly erroneous and states no grounds for unfair prejudice; nor can the Court ascertain any prejudice at all. When a jury advises that it is unable to reach a verdict, the district court has broad discretion in determining whether to grant or deny a mistrial on this basis. See Arizona v. Washington, 434 U.S. 497, 510 (1978); United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000). As the Supreme Court has observed, "the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." Arizona, 434 U.S. at 510 n.28.

In this case, it was the Court's judgment that the best course under the circumstances was to give the jury more time to deliberate and to instruct the jurors on how best to use their time to see if they could arrive at a verdict. (Trial Tr. at 570-71.) Having already requested several exhibits, clarifications, and portions of testimony (e.g., id. at 538, 547, 554, 555), the jury had exhibited a serious approach to its deliberations and a willingness to deliberate. The Court recommended that the jurors review the

charge, determine if there was disagreement or confusion as to the charge such that they might want further explanation, go back through the evidence, and determine if there was disagreement as to their recollection of the testimony that might be resolved by a reading of testimony or a request for transcripts. (Id. at 570-71.) After giving the instruction, the Court offered counsel to have a sidebar, but both parties declined and had nothing further to say. (Id. at 571.)

The jury appeared to heed the Court's guidance and, after resuming deliberations, returned another note toward the end of the trial day requesting twelve copies of the entire transcript of Parole Officer Harry Ramirez's testimony (portions of which had already been read to the jury upon its earlier request), along with twelve highlighters. (Id. at 572.) The jury was excused for the weekend and, upon its return on July 30, 2007, provided with the requested copies and highlighters. (Id. at 577.) At 1:50 p.m. that day, the jury returned a guilty verdict. (Id. at 578-79.) Its verdict was a result of what appeared to be a conscientious deliberative process, and it cannot be inferred from the record that the jurors at any time believed they had no choice but to return a verdict.


CONCLUSION

For the foregoing reasons, Defendant's motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure are denied.

IT IS SO ORDERED.

Dated:  New York, New York
        October 10, 2007

                                        _____
                                            Robert P. Patterson, Jr.
                                                  U.S.D.J.


23

**Copies of this Opinion and Order sent to:**

Attorney for Defendant
Erika McDaniel Edwards, Esq.
Law Offices of Donaldson, Chilliest & McDaniel, LLP
103 East 125th Street, Suite 1102
New York, NY 10035
Tel:  (212) 722-4900
Fax:  (212) 722-4966

Michael J. Garcia, United States Attorney
Southern District of New York
ATTN:  Julian J. Moore and Jessica A. Masella
One St. Andrew's Plaza
New York, NY 10007
Tel:  (212) 637-2473
Fax:  (212) 637-2387